# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO.** 18cr609 |
| **KAMALDEEP GANDHI**<br>**Defendant.** | |

## PLEA AGREEMENT

The United States of America, by and through Sandra Moser, Acting Chief of the Fraud Section, Criminal Division, United States Department of Justice ("Fraud Section"), and Ryan K. Patrick, United States Attorney for the Southern District of Texas (collectively, the "United States"); and the defendant, KAMALDEEP GANDHI ("Defendant"), and Defendant's counsel, pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure, state that they have entered into an agreement ("Agreement"), the terms and conditions of which are as follows:

### Defendant's Agreement

1.      Defendant agrees to plead guilty to Counts One and Two of the Criminal Information filed in this case, which charges Defendant with two counts of conspiracy, in violation of Title 18, United States Code, Section 371, to commit: (a) wire fraud, in violation of Title 18, United States Code, Section 1343; (b) commodities fraud, in violation of Title 18, United States Code, Section 1348; and (c) spoofing, in violation of Title 7, United States Code, Sections 6c(a)(5)(C) and 13(a)(2).   Defendant, by entering this plea, agrees that he is waiving any right to have the facts that the law makes essential to the punishment either charged in an indictment, or proved to a jury, or proven beyond a reasonable doubt.

2.      Defendant has read the charges against him contained in the Criminal Information, and those charges have been fully explained to him by his attorney.

3.      Defendant fully understands the nature and elements of the crimes with which he has been charged.

### Punishment Range

4.      The statutory maximum penalty for a violation of Title 18, United States Code, Section 371, is imprisonment of not more than five years and a fine of not more than $250,000, or twice the gross gain or gross loss resulting from the offense, whichever is greater.   Additionally, Defendant may receive a term of supervised release after imprisonment of up to three years.   *See* 18 U.S.C. §§ 3559(a)(3) and 3583(b)(2).   Defendant acknowledges and understands that if he should violate the conditions of any period of supervised release which may be imposed as part of his sentence, then Defendant may be imprisoned for ~~the entire term of supervised release~~ up to two years on each count, without credit for time already served on the term of supervised release prior to such violation.   *See* 18 U.S.C. §§ 3559(a)(3) and 3583(e)(3).   Defendant understands that he cannot have the imposition or execution of the sentence suspended, nor is he eligible for parole.

5.      Defendant further understands that, pursuant to 18 U.S.C. § 3663A, the Court must order restitution for persons directly and proximately harmed as a result of Defendant's violation of Count One (Conspiracy) and Count Two (Conspiracy), in an amount determined by the Court. Defendant understands that the forfeiture of property, real or personal, which constitutes or is derived from proceeds traceable to the offense, is part of the sentence that must be imposed in this case, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

-2-

**Mandatory Special Assessment**

6.      Pursuant to 18 U.S.C. § 3013(a)(2)(A), immediately after sentencing, Defendant agrees pay to the Clerk of the United States District Court a special assessment in the amount of one hundred dollars ($100.00) per count of conviction.   The payment will be by cashier's check or money order, payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

**Immigration Consequences**

7.      Defendant recognizes that pleading guilty may have consequences with respect to his immigration status.   Defendant understands that if he is not a citizen of the United States, by pleading guilty he may be removed from the United States, denied citizenship, and denied admission to the United States in the future.   Defendant understands that if he is a naturalized United States citizen, pleading guilty may result in immigration consequences, such as denaturalization and potential deportation or removal from the United States.   Defendant's attorney has advised Defendant of the potential immigration consequences resulting from Defendant's plea of guilty, and Defendant affirms that he wants to plead guilty regardless of any immigration consequences that may result from the guilty plea and conviction.

**Cooperation**

8.      Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the Fraud Section and/or the United States Attorney's Office for the Southern District of Texas.   This cooperation shall include making himself physically available in the Southern District of New York, the Southern District of Texas, or any other District, and providing complete and truthful information during any investigation

-3-

and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding.   Defendant further agrees to make himself available by telephone within seven (7) calendar days of any request by the Fraud Section and/or the United States Attorney's Office for the Southern District of Texas.

9.   Defendant understands and agrees that "fully cooperate," as that term is used herein, includes providing all information relating to any criminal activity known to Defendant, including but not limited to wire fraud, commodities fraud, and spoofing in the futures contracts markets.   Defendant understands that such information includes both state and federal offenses arising therefrom.   In that regard:

a.   Defendant agrees that this Agreement binds only the Fraud Section, the United States Attorney for the Southern District of Texas, and Defendant; it does not bind any other United States Attorney or any other section of the Department of Justice;

b.   Defendant agrees to testify fully and truthfully as a witness before a grand jury or in any other judicial or administrative proceeding when called upon to do so by the United States.   Defendant further agrees to waive his Fifth Amendment privilege against self-incrimination for the purpose of this Agreement;

c.   Defendant agrees to voluntarily attend any interviews and conferences as the United States may request;

d.   Defendant agrees to provide truthful, complete, and accurate information and testimony and understands any false statements made by Defendant to the Grand Jury or at any court proceeding (criminal or civil), or to a government agent or attorney, can and will be prosecuted under the appropriate perjury, false statement, or obstruction statutes;

-4-

e.      Defendant agrees to provide to the United States all documents and other evidence in his possession or under his control relating to all areas of inquiry and investigation; and

f.      Should the recommended departure, if any, not meet Defendant's expectations, Defendant understands that he remains bound by the terms of this Agreement and cannot, for that reason alone, withdraw his plea.

### Agreements Relating to Sentencing

10.      At the time of sentencing, the United States shall make known to the sentencing judge the extent of Defendant's cooperation.   The parties understand this Agreement carries the potential for a motion for departure under Sentencing Guideline § 5K1.1.   Defendant understands and agrees that whether such a motion is filed will be determined solely by the United States through the United States Attorney's Office for the Southern District of Texas and the Fraud Section.   If the United States determines, in its sole judgment and discretion, that Defendant has provided full and truthful cooperation as required by this Agreement, and has rendered "substantial assistance," then the United States reserves the sole right to move the Court, pursuant to Guideline § 5K1.1, to depart downward from the low end of the applicable Guideline range.   Defendant further agrees to persist in that plea through sentencing and to fully cooperate with the United States.   Defendant understands and agrees that the United States will request that sentencing be deferred until that cooperation is complete.

11.      If the United States does not move the Court, pursuant to Guideline § 5K1.1, to depart from the applicable Guideline range, the preceding paragraph of this Agreement will be inoperative, both parties shall be free to recommend any sentence, and the Court shall impose a

sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to Guidelines § 5K1.1. Defendant may not withdraw his plea of guilty because the United States has failed to make a motion pursuant to Guideline § 5K1.1.

12.     It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, Defendant will have no right to withdraw his guilty plea.

### The United States' Agreements

13.     The United States agrees to each of the following:

a.     If Defendant pleads guilty to Counts One and Two of the Criminal Information and persists in that plea through sentencing, and if the Court accepts this Agreement, the Fraud Section and the United States Attorney's Office for the Southern District of Texas agree that they will not further criminally prosecute Defendant for offenses arising from conduct set forth in the Criminal Information and this Agreement;

b.     If the Court determines that Defendant qualifies for an adjustment under Guideline § 3E1.1(a) of the United States Sentencing Guidelines, and the offense level prior to operation of Guideline § 3E1.1(a) is 16 or greater, the United States will move under Guideline § 3E1.1(b) for an additional one-level reduction because Defendant timely notified authorities of his intent to plead guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources more efficiently; and

-6-

    c.      The Fraud Section and the United States Attorney's Office for the Southern District of Texas will bring this Agreement and the full extent of Defendant's cooperation to the attention of other prosecuting offices, if requested.

### Agreement Binding – Fraud Section and Southern District of Texas Only

14.      This Agreement binds only the Fraud Section, the United States Attorney's Office for the Southern District of Texas, and Defendant.   This Agreement does not bind any other United States Attorney's Office or any other section of the United States Department of Justice.

15.      This Agreement concerns criminal liability only.   Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against Defendant or any other person or entity.   The obligations of this Agreement are limited to the Fraud Section and the United States Attorney's Office for the Southern District of Texas and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### United States' Non-Waiver of Appeal

16.      The United States reserves the right to carry out its responsibilities under the United States Sentencing Guidelines.   Specifically, the United States reserves the right:

    a.      To bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

    b.      To set forth or dispute sentencing factors or facts material to sentencing;

c.      To seek resolution of such factors or facts in conference with Defendant's counsel and the Probation Office;

d.      To file a pleading relating to these issues, in accordance with Guideline § 6A1.2 and 18 U.S.C. § 3553(a); and

e.      To appeal the sentence imposed or the manner in which it was determined.

### Waiver of Rights

17.     Defendant understands that by entering into this Agreement, he surrenders certain rights as provided in this Agreement.

18.     **Waiver of Trial Rights**.   Defendant understands that the rights of a defendant include the following:

a.      If Defendant persisted in a plea of not guilty to the charges, Defendant would have the right to a public and speedy jury trial with the assistance of counsel.   The trial may be conducted by a judge sitting without a jury if Defendant, the United States, and the Court all agree.

b.      At a jury trial, the jury would be composed of twelve citizens from the district, selected at random.   Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

c.      If the trial is a jury trial, the jury would be instructed that Defendant is presumed innocent, that the United States has the burden of proving Defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all

-8-

the evidence, it was persuaded of his guilt beyond a reasonable doubt.   The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

      d.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded that the United States had established Defendant's guilt beyond a reasonable doubt.

      e.     At a trial, whether by a jury or a judge, the United States would be required to present witnesses and other evidence against Defendant.   Defendant would have the opportunity to confront those government witnesses and his attorney would be able to cross-examine them.

      f.     At a trial, Defendant could, but would not be required to, present witnesses and other evidence on his own behalf.   If the witnesses for Defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court.

      g.     At a trial, Defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from his refusal to testify. However, if Defendant desired to do so, he could testify on his own behalf.

19.    **Waiver of Appellate and Collateral Review Rights.**   Defendant understands that he is waiving all appellate issues that might have been available if he had exercised his right to trial.   Defendant is aware that 28 U.S.C. § 1291, and 18 U.S.C. § 3742, afford a defendant the right to appeal the conviction and sentence imposed.   Defendant is also aware that 28 U.S.C. § 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the judgment of conviction and sentence has become final.

      a.      Acknowledging this, Defendant knowingly and voluntarily waives the right to appeal or "collaterally attack" his conviction and sentence, and his right to challenge his sentence, and the manner in which the sentence was determined, including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution or forfeiture, except that Defendant does not waive the right to raise a claim of ineffective assistance of counsel on direct appeal, if otherwise permitted, or on collateral review in a motion under 28 U.S.C. § 2255.   Defendant's knowing and voluntary waiver of the right to appeal or collaterally attack the conviction and sentence includes waiving the right to raise on appeal or on collateral review any argument that (i) the statute to which Defendant is pleading guilty is unconstitutional and (ii) the admitted conduct does not fall within the scope of the statute.

      b.      In the event Defendant files a notice of appeal following the imposition of the sentence or later collaterally attacks his conviction or sentence, the United States will assert its rights under this Agreement and seek specific performance of these waivers.

20.      Defendant hereby waives any and all objections, motions, and defenses based upon the Statute of Limitations.

21.      Defendant agrees that venue exists in the Southern District of Texas for the charge against him in the Criminal Information.   Defendant hereby waives any and all objections, motions, and defenses based upon venue, and waives the right to challenge or appeal venue.

22.      Defendant understands and agrees that each and all waivers contained in the Agreement are made in exchange for the concessions made by the United States in this Agreement.

23.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Sentence Determination

24.     In agreeing to these waivers in paragraphs 18 – 21 above, Defendant is aware that a sentence has not yet been determined by the Court.   Defendant is also aware that any estimate of the possible sentencing range under the United States Sentencing Guidelines that he may have received from his counsel, the United States, or the Probation Office, is a prediction and not a promise, did not induce his guilty plea, and is not binding on the United States, the Probation Office, or the Court.   The United States does not make any promise or representation concerning what sentence Defendant will receive.   Defendant further understands and agrees that the United States Sentencing Guidelines are "effectively advisory" to the Court.   *See United States v. Booker*, 543 U.S. 220 (2005).   Accordingly, Defendant understands that, although the Court must consult the Sentencing Guidelines and consider them when sentencing Defendant, the Court is not bound to follow the Sentencing Guidelines nor sentence Defendant within the calculated Guideline range.

25.     Defendant is aware that the sentence will be imposed after consideration of the United States Sentencing Guidelines and Policy Statements, which are only advisory, as well as the provisions of 18 U.S.C. § 3553(a).   Defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offense to which Defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable Sentencing

Guidelines.   Defendant understands and agrees that the parties' positions regarding the application of the Sentencing Guidelines do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge.   If the Court should impose any sentence up to the maximum established by statute, Defendant cannot, for that reason alone, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this Agreement.

### Presentence Investigation Report/Post-Sentence Supervision

26.   Defendant understands that the United States, in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing, shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of Defendant's conduct regarding the charge against him, and related matters.   The United States will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of Defendant's cooperation.

27.   Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, the Fraud Section, and the United States Attorney for the Southern District of Texas regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer.   Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of 18 U.S.C. § 1001 or as a contempt of the Court.

-12-

28.     For the purpose of monitoring Defendant's compliance with his obligations to pay

a fine, restitution, and/or forfeiture during any term of supervised release or probation to which

defendant is sentenced, Defendant further consents to the disclosure of his tax returns (together

with extensions, correspondence, and other tax information) and related tax filings and materials

to the Probation Office, the Fraud Section, and the United States Attorney for the Southern District

of Texas filed subsequent to Defendant's sentencing, to and including the final year of any period

of supervised release or probation to which Defendant is sentenced.

### Other Terms

29.     Defendant agrees to cooperate with the United States in collecting any unpaid fine,

forfeiture, and restitution for which Defendant is liable, including, upon request, providing

financial statements under oath or affirmation and supporting records and submitting to interviews

by the United States and the U.S. Probation Office regarding Defendant's capacity to satisfy any

fines, restitution, or forfeiture.

30.     Defendant understands that any person convicted of a felony under 7 U.S.C. § 13

shall be suspended from registration under that chapter and shall be denied registration or re-

registration for five years or such longer period as the U.S. Commodity Futures Trading

Commission ("CFTC") may determine, and barred from using, or participating in any manner in,

any market regulated by the CFTC for five years or such longer period as the CFTC shall

determine, on such terms and conditions as the CFTC may prescribe, unless the CFTC determines

otherwise.   Defendant understands that nothing in this Agreement alters the CFTC's statutory

authority or discretion to effect any such suspension, denial, or bar against him, or otherwise binds

the CFTC in any way.   Defendant nevertheless affirms that Defendant wants to plead guilty

-13-

regardless of any collateral consequences that Defendant's plea may entail under 7 U.S.C. § 13, or other applicable laws relating to the CFTC's authority over Defendant.

**Factual Basis for Guilty Plea**

31.     Defendant is pleading guilty because he is in fact guilty of the charges contained in Counts One and Two of the Criminal Information.   In pleading guilty, Defendant admits the facts alleged in Counts One and Two of the Criminal Information as well as the facts set forth in paragraph 32 of this Agreement (collectively, the "Facts").   Defendant further admits that, if this case were to proceed to trial, the United States could prove each element of the offense beyond a reasonable doubt and that the Facts establish his guilt beyond a reasonable doubt.

32.     The following facts, among others, would be offered to establish Defendant's guilt:
<u>Criminal Offenses</u>

    a.     With respect to Count One, during the period from in or around March 2012 and continuing through in or around March 2014 ("Conspiracy Period A"), in the Southern District of Texas and elsewhere, Defendant did willfully, that is, with the intent to further the objects of the conspiracy, knowingly combine, conspire, confederate, and agree with others to commit certain offenses against the United States, that is:

        i.     wire fraud, that is, to knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce,

-14-

writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343;

ii.      commodities fraud, that is, to knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud a person in connection with a commodity for future delivery, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of a commodity for future delivery, that is, E-Mini Dow futures contracts, E-Mini NASDAQ 100 ("E-Mini NASDAQ") futures contracts, and E-Mini S&P 500 ("E-Mini S&P") futures contracts, in violation of Title 18, United States Code, Section 1348; and

iii.      spoofing, that is, to knowingly engage in trading, practice, and conduct, on and subject to the rules of registered entities, namely the Chicago Mercantile Exchange ("CME") and the Chicago Board of Trade ("CBOT"), that was "spoofing," that is, bidding and offering with the intent, at the time the bid and offer was entered, to cancel the bid and offer before execution, in violation of Title 7, United States Code, Sections 6c(a)(5)(C) and 13(a)(2).

All in violation of Title 18, United States Code, Section 371.

b.      In furtherance of the conspiracy charged in Count One and to effect its unlawful objects, Defendant committed and caused to be committed, in the Southern District of Texas and elsewhere, the following overt acts, among others:

i.      On or about November 25, 2013, at approximately 10:41:48.644 a.m. Central Time, Defendant placed seven Spoof Orders to sell a total of 181 E-Mini S&P futures contracts at the price of $1,804.75; and

ii.     On or about November 25, 2013, at approximately 10:41:48.645 a.m. Central Time, Defendant placed 15 Spoof Orders to sell a total of 419 E-Mini S&P futures contracts at the price of $1,804.75.

c.      With respect to Count Two, during the period from in or around May 2014 and continuing through in or around October 2014 ("Conspiracy Period B"), in the Southern District of Texas and elsewhere, Defendant did willfully, that is, with the intent to further the objects of the conspiracy, knowingly combine, conspire, confederate, and agree with others to commit certain offenses against the United States, that is:

i.      wire fraud, that is, to knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343;

        ii.        commodities fraud, that is, to knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud a person in connection with a commodity for future delivery, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of a commodity for future delivery, that is, E-Mini S&P 500 futures contracts, in violation of Title 18, United States Code, Section 1348; and

        iii.        spoofing, that is, to knowingly engage in trading, practice, and conduct, on and subject to the rules of registered entities, namely the CME, that was "spoofing," that is, bidding and offering with the intent, at the time the bid and offer was entered, to cancel the bid and offer before execution, in violation of Title 7, United States Code, Sections 6c(a)(5)(C) and 13(a)(2).

All in violation of Title 18, United States Code, Section 371.

        d.      In furtherance of the conspiracy charged in Count Two and to effect its unlawful objects, Defendant committed and caused to be committed, in the Southern District of Texas and elsewhere, the following overt acts, among others:

        i.        On or about September 25, 2014, at approximately 12:44:36.390 a.m. Central Time, Defendant placed one Spoof Order to sell seven E-Mini S&P futures contracts at the price of $1,963.50;

        ii.        On or about September 25, 2014, at approximately 12:44:36.391 a.m. Central Time, Defendant placed 11 Spoof Orders to sell a total of 123 E-Mini S&P futures contracts at the price of $1,963.50; and

iii.     On or about September 25, 2014, at approximately 12:44:36.392 a.m. Central Time, Defendant placed 11 Spoof Orders to sell a total of 120 E-Mini S&P futures contracts at the price of $1,963.50.

Defendant and Relevant Entities

e.     From approximately September 2010 to approximately March 2014, Defendant was employed as a trader at a proprietary trading firm with offices located in, among other places, Chicago, Illinois and New York, New York (hereinafter, "Trading Firm A").

i.     During Conspiracy Period A, Defendant worked with two co-conspirators, Trader 2 and Trader 3, on a trading team (hereinafter, the "Trading Team A") that traded, among other things, futures contracts on the CME and CBOT.     Defendant and Trader 2 were the co-heads on Trading Team A.

ii.     During Conspiracy Period A, Executive 1 was a senior risk manager at Trading Firm A whose role included, among other things, approving increases in risk limits for traders at Trading Firm A.     Defendant and Trader 2 worked closely with Executive 1 in order to manage risk generated by Trading Team A's futures contracts trading, while maximizing the profits Trading Team A realized on behalf of Trading Firm A.

f.     From approximately May 2014 to approximately October 2014, Defendant was employed as a trader at a second proprietary trading firm with an office located in, among other places, Chicago, Illinois (hereinafter, "Trading Firm B").

-18-

i.      During Conspiracy Period B, Defendant worked with a co-conspirator, Trader 4, on a trading team (hereinafter, "Trading Team B") that traded, among other things, futures contracts on the CME.   Trader 4 was the lead trader on Trading Team B and recruited Defendant to join Trading Team B.

g.      The CME Group Inc. ("CME Group") was a commodities marketplace made up of several exchanges, including CME and the CBOT, which were based in Chicago, Illinois.   At all relevant times, CME and CBOT were entities registered with the CFTC, operating as Designated Contract Markets with self-regulatory responsibilities, and were subject to regulation by the CFTC.   CME and CBOT utilized an electronic trading system called "Globex."

h.      Victim 1 is a quantitative finance company with offices located in Houston, Texas, in the Southern District of Texas.

Futures Contracts Trading on the CME

i.      Globex was a global electronic trading platform operated by CME Group, which utilized computer servers located in Chicago and Aurora, Illinois.   Trading on Globex was conducted electronically using a visible "order book" that displayed quantities of anonymous orders (*i.e.*, offers to sell futures contracts and bids to buy futures contracts) at various price points, or "levels."   Globex allowed market participants to trade futures contracts either at the exchange itself or from a location virtually anywhere in the world. Through Globex, markets operated by the CME Group offered trading opportunities in various futures contracts, including E-Mini Dow, E-Mini NASDAQ, and E-Mini S&P.

j.      CME and CBOT, through the Globex system, allowed traders to place orders in the form of "bids" to buy or "offers" to sell a futures contract.   An order was "filled" or "executed" when a buyer and seller bought and sold a particular contract.   The minimum price increment at which a futures contract could trade on CME and CBOT was called a "tick," and the value of a tick for each contract was set by CME and CBOT. Futures contracts traded on set, periodic expiration cycles (*i.e.*, monthly or quarterly).

k.      An "iceberg" order was a type of order that traders could place when trading futures contracts on the CME and CBOT.   In an iceberg order, the total amount of the order was divided into a certain pre-set quantity that was visible to other market participants, and the remainder of the order that was not visible to other market participants. Whenever the visible portion of the order was filled, the same, pre-set quantity of the remaining, hidden portion automatically became visible; this process repeated until the remainder of the order was either executed or canceled.

l.      In order to trade futures contracts on the CME or CBOT, a trader utilized a unique identifier called a Tag 50 that connected a particular market participant with a specific order, modification, or cancellation placed on the CME or CBOT.

i.      During Conspiracy Period A, the Tag 50 YB02 was assigned to Defendant, and YB01 and YB04 were assigned to Trader 3.    During the Conspiracy Period A, the Tag 50s YB01, YB02, and YB04 were used interchangeably by Defendant, Trader 2, and Trader 3 at various times to place orders for futures contracts on the CME or CBOT.   All orders placed using the Tag 50s YB01, YB02, and YB04 are traceable to the Trading Team A.

ii.      During Conspiracy Period B, the Tag 50 KG-BAT1 was assigned to Defendant.

m.      A futures contract was a standardized, legally binding agreement that, once executed, obligated the parties to the contract to buy or to sell a specific product or financial instrument in the future. That is, the buyer and seller of a futures contract agreed on a price today for a product or financial instrument to be delivered (by the seller), in exchange for money (to be provided by the buyer), on a future date.

n.      Futures contracts were traded on markets designated and regulated by CFTC, the federal agency established by federal statute to regulate, among many other things, transactions related to and involving the purchase and sale of futures contracts.

o.      E-Mini Dow was a stock market index futures contract that represented an agreement to buy or sell the future cash value of the Dow Jones Industrial Average, which was an index of 30 U.S. stocks, at a specified date and traded on the CBOT.

p.      E-Mini NASDAQ was a stock market index futures contract that represented an agreement to buy or sell the future cash value of the NASDAQ 100, which was an index of 100 U.S. stocks, at a specified date and traded on the CME.

q.      E-Mini S&P was a stock market index futures contract that represented an agreement to buy or sell the future cash value of the S&P 500, which was an index of 500 U.S. stocks, at a specified date and traded on the CME.

Overview of the Conspiracy at Trading Firm A

r.      During and in furtherance of the conspiracy, and in order to make money for themselves and for Trading Firm A, Trading Team A, from Trading Firm A's offices

located in New York, New York, and Chicago, Illinois, placed electronic trading orders with the CME and CBOT, through Globex, whose servers were located in and around Chicago, Illinois. Such wire communications travelled in interstate commerce because the Trading Team A executed such wire communications from locations outside of Illinois, which ultimately traveled to Trading Firm A's servers located in Chicago and Aurora, Illinois. The information in these wires was transmitted to, and relied upon by, market participants, including market participants located in the Southern District of Texas.

s. Trading Team A, while employed by Trading Firm A and in the scope of their employment at Trading Firm A, placed, and conspired to place, thousands of orders to buy or to sell E-Mini Dow, E-Mini NASDAQ, and E-Mini S&P futures contracts that Trading Team A intended, at the time the orders were placed, to cancel before they could be executed (the "Spoof Orders").

t. Trading Team A's purpose, intent, and motivation in placing the Spoof Orders was to create a materially false and misleading impression of supply (when they were placing Spoof "sell" orders) and demand (when they were placing Spoof "buy" orders) in order to induce other market participants, including those located in the Southern District of Texas, to react to the Spoof Orders and to engage in transactions to buy or to sell futures contracts at prices, quantities, and/or times that, but for Trading Team A's Spoof Orders, they would not otherwise have traded. In placing the Spoof Orders, Trading Team A intended to transmit false and misleading liquidity and price signals into the CME and/or CBOT in order to induce other market participants, including those located in the Southern District of Texas, to react to this false and misleading information and trade

against genuine orders placed by Trading Team A on the opposite side of the market (the "Primary Orders") at prices more favorable to Trading Team A. In thousands of instances, Trading Team A sought to induce, and in certain instances did induce, other market participants, including those located in the Southern District of Texas, to react, and artificially increase the number of market participants willing to transact in futures contracts at an existing price, or artificially depress (in the case of Spoof "sell" orders) or artificially inflate (in the case of Spoof "buy" orders) the price of E-Mini Dow, E-Mini NASDAQ, and E-Mini S&P futures contracts—all so that Trading Team A and Trading Firm A could profit, mitigate potential losses, and/or liquidate Primary Orders at a more favorable price, quantity, and/or time than was otherwise available before the Spoof Orders were placed.

u.     Trading Team A was able to generate trading profits (or mitigate losses)— which benefitted them and Trading Firm A—by executing their Primary Orders close in time with the placement of their Spoof Orders.

v.     Defendant personally benefited from deceiving and manipulating the market using Spoof Orders in numerous ways, including by way of continued employment and compensation from Trading Firm A, which compensation was based in part on his trading profits. At all times during and in furtherance of the conspiracy, Defendant (i) was an employee of Trading Firm A, (ii) acted with the intent, at least in part, to benefit Trading Firm A, and (iii) acted within the scope of his authority and employment at Trading Firm A. Trading Firm A benefitted from Trading Team A's deception and

manipulation of the market using Spoof Orders by realizing greatly increased profits from Trading Team A's trading activity.

w.     During the Conspiracy Period A, Trading Team A placed thousands of Spoof Orders for E-Mini Dow futures contracts on the CBOT, and for E-Mini NASDAQ and E-Mini S&P futures contracts on the CME.   Defendant agrees that the United States has calculated that Spoof Orders that Defendant himself placed generated trading gains to Trading Team A and Trading Firm A of approximately $9,100,000 and caused market losses of approximately $34,400,000, and that Trading Team A's Spoof Orders collectively generated trading gains to Trading Team A and Trading Firm A of approximately $15,800,000, and caused market losses of approximately $61,500,000.

x.     Defendant and Trader 2 discussed with Executive 1 the use of Spoof Orders in the E-Mini S&P market as part of the trading strategy implemented by Trading Team A on behalf of Trading Firm A.

    i.     In conversations with Executive 1, Defendant and Trader 2 described their trading strategy and their use of order book pressure, and other strategies consistent with "spoofing" activity, to obtain favorable fills on behalf of themselves and Trading Firm A.   Trader 2 often used the word, "stuff," in these conversations to describe Trading Team A's trading strategy such as, for example, saying the team needed more "bullets" to stuff the order book.

    ii.     Based on these conversations, Defendant believed that Executive 1 understood the details of spoofing strategies employed by Trading Team A, what Trading Team A perceived others to be doing in the market, and why Trading

Team A needed higher risk limits to be in be a position to trade in response to trading activity by other large traders in the E-Mini S&P market.

iii.      Defendant and Trader 2 typically had conversations with Executive 1 regarding their trading limits either in person or over the phone because Executive 1 had told Defendant that he would not discuss matters relating to trading strategy over email, as a matter of practice, and Executive 1 had directed Defendant not to discuss the same over email.

y.      During 2012, Defendant and Trader 2 had regular discussions with Executive 1 regarding Trading Team A's trading strategy and the trading activity by other traders in the E-Mini S&P futures contracts market and how Trading Team A could trade in a way that would maximize profits for Trading Firm A.

i.      One topic of conversation they discussed was trading activity in the market that Trading Team A believed was attributable to a well-known futures trader ("Trader 5"), who was one of the biggest traders in the E-Mini S&P futures contracts market and had a reputation for engaging in spoofing.    These conversations included the fact that Trading Team A would be more successful taking on other large traders in the E-Mini S&P market, including Trader 5, if Trading Firm A provided Trading Team A with increased risk limits for their trading.

ii.      On one occasion, Executive 1 told Defendant and Trader 2 that they needed to increase the profit-and-loss ("PnL") for Trading Team A.   In response, Trader 2 told Executive 1 that it was difficult to trade on the opposite side of the

market from Trader 5 and that Trading Team A needed increased trading limits, or more "bullets," so that they could, for example, "stuff" the bids when they perceived that Trader 5 was placing large orders on, and himself trying to "stuff," the offer.

        iii.      In late 2012, Defendant discussed with Executive 1 that increased risk limits would lead to a substantial increase in Trading Team A's PnL, because Defendant and Trader 2 could trade larger size orders in reaction to other trading activity in the market, such as by Trader 5, and because Defendant and Trader 2 could begin placing large orders to create order book pressure in order to get more favorable fills on the opposite side of the large orders.

        z.      In response to Defendant and Trader 2's request, Trading Team A's risk limits were increased incrementally by Trading Firm A, because Trading Firm A's management wanted Trading Team A to demonstrate success in its trading strategy as the team's risk limits increased.   In his role as the chief risk manager at Trading Firm A, Executive 1 was responsible for approving risk limits increases for every trader at the firm, including the traders on Trading Team A.

        i.      In or around November 2012, Trading Team A's risk limits for E-Mini S&P futures contracts were between 700 and 1,000 contracts, meaning the team could not collectively have submit orders greater than that limit.

        ii.      In or around early 2013, Trading Firm A increased Trading Team A's risk limits E-Mini S&P futures contracts threefold, to between approximately 2,500 and 3,000 contracts.

-26-

aa.     In or around the end of 2012, Trading Team A's PnL results improved significantly as a result of it placing Spoof Orders as part of its trading strategy.

bb.     In or around May 2013, Trading Team A had its best trading day ever with an estimated PnL gain to Trading Team A, and for the benefit of Trading Firm A, of approximately $400,000.

  i.     After this occurred, Executive 1 met with Defendant to congratulate him on the trading day.   Executive 1 told Defendant that his team was doing well, but not to get too reckless in his trading and that he should not imbalance the order book too much.

  ii.     In conversations with Defendant, Executive 1 would caution Defendant not to imbalance the order book too much, and to control the degree to which Defendant created an imbalance, which Defendant understood to be references to placing orders that Defendant did not intend to execute.

cc.     In or around May 2013, a few days after Trading Team A's best trading day referenced above, Defendant attended an event hosted by Trading Firm A on the rooftop of its office building in New York City.

  i.     At the event, Defendant spoke with the founder and managing director of Trading Firm A ("Managing Director 1") who congratulated Defendant on his team's best trading day.   Managing Director 1 said he would provide Defendant with anything he needed for his trading, and that Defendant should come to Managing Director 1 directly with any request, because Managing Director 1 wanted to have other days like Defendant's large PnL gain on a regular basis.

-27-

ii.      Defendant interpreted Managing Director 1's offer of assistance as a reference to increased risk limits.   Managing Director 1 had conveyed his satisfaction that Trading Team A accounted for approximately 30% of the total volume traded in E-Mini S&P futures contracts market on one trading day and was attacking the market share in the E-Mini S&P held by one of Trading Firm A's main competitors.   Managing Director 1 asked if Defendant's team could move into other futures markets and trade more volume.

iii.     At the time of this conversation, Defendant had no doubt that Managing Director 1 was aware that Trading Team A was placing Spoof Orders as part of its trading activity.   While Defendant never expressly told Managing Director 1 that he was spoofing, Defendant spoke with Managing Director 1 about the trading activity of other traders in the E-Mini S&P market, like Trader 5, that were known to engage in spoofing.   Executive 1 also told Defendant that Executive 1 had discussed Trading Team A's requests for more size and increased risk limits with Managing Director 1.

dd.    In or around November 2013, Executive 1 had a conversation with Defendant and Trader 2 regarding their spoofing activity, specifically in relation to certain trading activity by Trading Team A that Trading Firm A's compliance group had flagged. Executive 1 said he was concerned and asked Defendant and Trader 2 to look at the activity and to explain how they would explain it if asked.

i.      Executive 1, Defendant, and Trader 2 discussed how a regulatory agency might consider the flagged trading activity to be spoofing.   Executive 1

-28-

directed Defendant and Trader 2 to know how to respond if this type of trading activity was caught by any regulators in the future.

ii.      In response, Trader 2 invented a narrative that plausibly explained the flagged activity, but which was not, in fact, true because it omitted the material fact that the trading activity included placing Spoof Orders.   In response to Trader 2's proposed narrative, Executive 1 said effectively that he was okay with the narrative as long as Defendant and Trader 2 could defend it to a regulator regarding why the traders were cancelling orders.

iii.      Executive 1 told Defendant and Trader 2 that they needed to make sure they were able to explain away any similar trading activity that gets flagged and that they should always have an explanation.   Defendant understood Executive 1's direction to mean that they needed to be able to explain their trading activity using an explanation that concealed the material fact that Trading Team A's trading activity involved placing Spoof Orders.

ee.      On or about November 21, 2013, an employee in Trading Firm A's Infrastructure Group sent an email to members of Trading Team A with a copy to Trading Firm A's "riskmanagement" email address, an email alias which included Executive 1, that had the subject "CME Restrictions."   In the email, the Infrastructure Group employee wrote that Trading Firm A's "alert bots picked up the following restriction reached on CME."   Included in the email was information from Trading Firm A's systems showing that Trading Team A had violated certain risk limits when trading E-Mini S&P futures contracts.   The Infrastructure Group employee asked:   "Do you know what happened?"

i.       Defendant responded to the email, writing to, among others, the Infrastructure Group employee, Executive 1, Trading Team A, and "riskmanagement" email address, and stated: "Hi, we got swept on unwanted size. We promptly unloaded the position." By "swept on unwanted size," Defendant meant that several of Trading Team A's Spoof Orders, which were not meant to be executed, had been "swept" or filled. This statement was misleading, and Defendant knew it was misleading, because it did not include the material fact that Trading Team A was unlawfully spoofing the E-Mini S&P futures contracts market.

ii.      The following day, on or about November 22, 2013, Executive 1 replied to Defendant's email, writing to all the recipients of the email chain, and stated: "More today, and these include minmax. Please get this under control." In his email, Executive 1 included information from Trading Firm A's systems showing that Trading Team A had violated certain risk limits when trading E-Mini NASDAQ futures contracts. In response to the entire email chain, Defendant apologized and requested an increase in the team's risk limits for E-Mini NASDAQ futures contracts. Executive 1 replied to the entire email chain that he would increase the limits the following week.

iii.     On or about December 3, 2013, the same Infrastructure Group employee replied to all recipients on the same email chain, which included Executive 1, Defendant, and members of Trading Team A, saying that Trading Team A had violated risk limits again when trading E-Mini S&P futures contracts.

-30-

That same day, Trader 3 responded to and wrote:   "Hi, we got swept on unwanted size. We promptly unloaded the position. Thanks."   This statement was misleading, and Defendant knew it was misleading, because it did not include the material fact that Trading Team A was unlawfully spoofing the E-Mini S&P futures market.

ff.     In or around early December 2013, several days before the CME sent inquiries to Trading Firm A related to whether Trading Team A's trading activity constituted spoofing, Defendant and Trader 2 met with Executive 1 and Managing Director 1.

i.     Both Executive 1 and Managing Director 1 congratulated Defendant and Trader 2 on Trading Team A's PnL for the year and said they would support Defendant and Trader 2 with whatever they needed for their trading.

ii.     Executive 1 also told Defendant and Trader 2 that Trading Firm A's compliance function had reviewed Trading Team A's trading strategy, which had been flagged by Trading Firm A's compliance function (discussed above at paragraph 32(dd)),   and that Defendant and Trade 2 were "good to go."   At the time of this conversation, Defendant knew Executive 1 understood that Trading Team A's trading strategy involved spoofing because of prior conversations Defendant and Trader 2 had with Executive 1 about their need for higher risk limits, that is, more "bullets."

iii.     Managing Director 1 acknowledged Executive 1's comments about the compliance review and approval for Trading Team A to move forward, and

Managing Director 1 asked how he could support Trading Team A'sgrowth into trading in new markets.   As part of this conversation, Managing Director 1 approved large increases in Trading Team A's risk limits for the natural gas, crude oil, and gold futures contracts markets, which Defendant believed were excessive in size in terms of what was necessary to trade in these low-volume markets. Defendant interpreted these large risk limit increases by Managing Director 1 to trade in these new markets meant that Managing Director 1 understood that Trading Team A intended to place large orders that the team would use to obtain favorable fills on the opposite side of the market from the large orders.

gg.   On or about December 17, 2013, the CME sent Trading Firm A two inquiries related to Trading Group A's trading activity, and after the second inquiry, Executive 1 forwarded the CME's email to Defendant, requesting answers to the CME's inquiries and telling him to find an explanation that would explain it away.

i.   After receiving the inquiries, Executive 1 met with Defendant in New York and told Defendant to figure it out and find an answer to the CME's inquiries.

ii.   Defendant understood Executive 1's instruction to be that he should find a way to explain the trading activity at issue in a way that would address the CME's concerns, but not to tell the truth (*i.e.*, not admit the trading activity was spoofing).   After Defendant spoke with Trader 2 about the issue, Trader 2 wrote a memo, and submitted it to Executive 1, which did not accurately describe Trading

Team A's trading activity in question (*i.e.*, it did not acknowledge or explain that the trading activity involved spoofing).

iii.        Approximately one week later, Defendant, Trader 2, and Trader 3 met with Executive 1 and other members of Trading Firm A's compliance function. During the meeting, Defendant and Trader 3 read from the memo, which was materially false because it omitted the material fact that Trading Team A's trading activity involved placing Spoof Orders. While Defendant read a certain portion of the memo, Executive 1 interrupted to declare that the explanation made sense. Defendant understood Executive 1's statements to be addressed to both Defendant and Trader 3, as well as the Trading Firm A compliance employees, in order to indicate that Trading Team A had found a justification for their trading activity, when, in fact, the trading activity in question involved spoofing.

Defendant's Method of Spoofing at Trading Firm A

hh.     A common technique employed by Defendant was to place and cancel one or more Spoof Orders on one side of the market at the prevailing market price. By early 2013, Defendant regularly employed a trading strategy that involved placing Spoof Orders. The intent of these Spoof Orders was to facilitate the execution of an existing Primary Order on the opposite side of the market. By placing Spoof Orders opposite the Primary Order, Defendant intended to create a false appearance of supply or demand and induce other market participants, including those located in the Southern District of Texas, to react to this false information in order to move the market price and/or increase the available quantity at the desired price of the relevant futures contract. During the time the Spoof

Order was live in the market Defendant's Primary Order on the other side of the market often would execute at a more favorable price than was otherwise available before the Spoof Order had been placed.

      ii.     At all times during Conspiracy Period A, Defendant's purpose, intent, and motivation in conspiring with others in the placement of Spoof Orders was to create a false sense of supply or demand for purposes of inducing other market participants, including those located in the Southern District of Texas, to react, and artificially drive up or down the price of the E-Mini S&P, E-Mini Dow, and E-Mini NASDAQ futures contracts, or artificially increase the number of market participants willing to transact at the existing price, all so that Trading Team A, and, ultimately, Trading Firm A, could profit or mitigate their potential loss by executing their positions at more favorable prices, quantities, and/or times than were otherwise available before Trading Team A placed the Spoof Orders.

      jj.     While it was the intent of the conspiracy to use Spoof Orders in order to facilitate the execution of Primary Orders at a more favorable price than was otherwise available before the Spoof Order had been placed, the spoofing techniques described herein did not always achieve the outcome desired by Trading Team A. In some instances, the placement of Spoof Orders would not induce other market participants to trade at the level desired by Trading Team A, and Trading Team A would execute the Primary Order at the prevailing market price. In other instances, while it was the intent of Trading Team A to cancel a Spoof Order prior to its execution, all or part of the Spoof Order would execute, and Trading Team A would then act to reverse the unintended position, which reversal could generate a loss.

kk.     As one example of Defendant's pattern of trading activity that is summarized above:

i.      On or about November 25, 2013, at approximately 10:41:47.768 a.m. Central Time, Defendant placed an iceberg Primary Order to buy 600 E-Mini S&P futures contracts, with only 21 orders visible to the market, at the price of $1804.50, which was the best prevailing bid price at that point in time.

ii.     At approximately 10:41:48.644 a.m. Central Time, Defendant placed 7 Spoof Orders, which were not icebergs, to sell a total of 181 E-Mini S&P futures contracts at the price of $1,804.75, which was the best prevailing ask price at that point in time.     At approximately 10:41:48.645 a.m. Central Time, Defendant placed an additional 15 Spoof Orders to sell a total of 419 E-Mini S&P futures contracts at the same price of $1,804.75.     Together, Defendant's 22 Spoof Orders constituted approximately 62% of Trading Firm A's order book to sell E-Mini S&P futures contracts at those price levels.

iii.    Third, approximately 4 milliseconds after placing the final Spoof Order, Defendant's iceberg Primary Order to buy began to be filled and was completely filled at approximately 10:41:49.390 a.m. Central Time, giving Defendant an overall long position of 95 in the E-Mini S&P futures contracts market.

iv.     Defendant's Spoof Orders were capable of influencing, and did influence, other market participants' decision to trade E-Mini S&P futures contracts.     For example, approximately five milliseconds after Defendant placed

-35-

the final Spoof Order, at 10:41:48.650 a.m. Central Time, Victim 1 placed an order to sell 2 E-Mini S&P futures contracts at the price of $1,804.50, which was executed immediately.   These two futures contracts sold by Victim 1 were bought by Defendant as part of the 600 futures contracts from his iceberg Primary Order referenced in the paragraph above.

        v.        Approximately 234 milliseconds after the last fill of Defendant's Primary Order, at approximately 10:41:49.624 a.m. Central Time, Defendant cancelled his 22 Spoof Orders of a total of 600 lots to sell at the best prevailing ask price of $1,804.75 without any of the Spoof Orders being filled.   These Spoof Orders to sell had been active in the market for less than one second before Defendant cancelled them.

        ll.        During Conspiracy Period A, on behalf of Trading Team A and Trading Firm A, and in the scope of his employment at Trading Firm A, Defendant placed thousands of Spoof Orders for E-Mini S&P, E-Mini Dow, and E-Mini NASDAQ futures contracts.

## Overview of the Conspiracy at Trading Firm B

        mm.        During and in furtherance of the conspiracy, and in order to make money for himself, Trading Team B, and Trading Firm B, Defendant, from Trading Firm B's offices located in Chicago, Illinois, placed electronic trading orders with the CME, through Globex, whose servers were located in and around Chicago, Illinois.   These electronic trading orders caused wire communications to travel in interstate commerce and to be

-36-

transmitted to, and relied upon by, market participants located outside of Chicago, Illinois, including market participants located in the Southern District of Texas.

nn.     Defendant, on behalf of Trading Team B, while employed by Trading Firm B and in the scope of his employment at Trading Firm B, placed, and conspired to place, hundreds of orders to buy or to sell E-Mini S&P futures contracts that he intended, at the time the orders were placed, to cancel before they could be executed (the "Spoof Orders").

oo.     At all times during Conspiracy Period B, Defendant's purpose, intent, and motivation in placing the Spoof Orders was to create a materially false and misleading impression of supply (when they were placing Spoof "sell" orders) and demand (when they were placing Spoof "buy" orders) in order to induce other market participants, including those located in the Southern District of Texas, to react to the Spoof Orders and to engage in transactions to buy or to sell futures contracts at prices, quantities, and/or times that, but for Defendant's Spoof Orders, they would not otherwise have traded.   In placing the Spoof Orders, Defendant intended to transmit false and misleading liquidity and price signals into the CME in order to induce other market participants, including those located in the Southern District of Texas, to react to this false and misleading information and trade against genuine orders placed by Defendant on the opposite side of the market (the "Primary Orders") at prices more favorable to Defendant.   In hundreds of instances, Defendant sought to induce, and in certain instances did induce, other market participants, including those located in the Southern District of Texas, to react, and artificially increase the number of market participants willing to transact in futures contracts at an existing

-37-

price, or artificially depress (in the case of Spoof "sell" orders) or artificially inflate (in the case of Spoof "buy" orders) the price of E-Mini S&P futures contracts—all so that Defendant, Trading Team B, and Trading Firm B could profit, mitigate potential losses, and/or liquidate Primary Orders at a more favorable price, quantity, and/or time than was otherwise available before the Spoof Orders were placed.

pp.     Defendant was able to generate trading profits (or mitigate losses)—which benefitted him, Trading Team B, and Trading Firm B—by executing their Primary Orders close in time with the placement of their Spoof Orders.

qq.     Defendant personally benefited from deceiving and manipulating the market using Spoof Orders in numerous ways, including by way of continued employment and compensation from Trading Firm B, which compensation was based in part on his trading profits.    At all times during and in furtherance of the conspiracy, Defendant (i) was an employee of Trading Firm B, (ii) acted with the intent, at least in part, to benefit Trading Firm B, and (iii) acted within the scope of his authority and employment at Trading Firm B.    Trading Firm B benefitted from Defendant's deception and manipulation of the market using Spoof Orders by realizing greatly increased profits from Defendant's trading activity.

rr.     During Conspiracy Period B, Defendant placed hundreds of Spoof Orders for E-Mini S&P futures contracts on the CME.    Defendant agrees that the United States has calculated that Spoof Orders that Defendant himself placed generated trading gains to Trading Team B and Trading Firm B of approximately $626,000 and caused market losses of approximately $1,395,000.

ss.     In or around May 2014, Defendant joined Trading Team B at Trading Firm B after being recruited to join the team by Trader 4.

tt.     Around the time Defendant joined Trading Firm B, he had a conversation with Trading Firm B's then-chief executive officer ("Executive 2"), with Trader 4 present, regarding Defendant's trading style.     During that conversation, Executive 2 asked Defendant about his ability to engage in a style of trading involving large order sizes. Executive 2 described Defendant's trading strategy as similar to that of other traders in the market that were well-known for trading large order sizes, such as Trader 5 and another trading team at Trading Firm B.

uu.     When Defendant joined Trading Firm B, Trader 4, the head of Trading Team B, was aware that Defendant's trading strategy at Trading Firm A involved placing Spoof Orders.     At first, however, when trading at Trading Firm B, Defendant did not regularly engage in spoofing.     At some point in time, however, Trader 4 told Defendant that he brought Defendant to Trading Firm B to help Trader 4 grow and encouraged Defendant to increase the size of his trades, which Defendant understood to mean that he should begin placing Spoof Orders like he did at Trading Firm A.     In response, Defendant told Trader 4 that Trading Team A's trading had been flagged at Trading Firm A for spoofing and that he was hesitant to do the same at Trading Firm B.     Trader 4 replied that, as long as Defendant stayed within certain parameters set by Trading Firm B, even if he was spoofing, he would be fine.     Defendant understood that Trading Firm B set certain trading parameters, and it took the position that a trader could not engage in spoofing if the trader was within the parameters and that a trader who was within the parameters could not

be spoofing.    Despite this, Defendant engaged in spoofing at Trading Firm B while trading within the firm's parameters.

vv.    Defendant had conversations with Trading Firm B's management regarding the size of the risk limits for his trading.    In those conversations, Defendant said he had an average trade size of a certain size (*e.g.*, X) and that meant he needed a multiple of that size (*e.g.*, 5X) for his risk limits.    Defendant needed this large multiple for his risk limits so that he could apply enough pressure in the order book with his Spoof Orders. Defendant believes that Trading Firm B's management understood he needed these large risk limits for him to use to place Spoof Orders.

ww.    Through conversations with Trader 4, Defendant came to understand that a senior executive at Trading Firm B ("Executive 3") was aware that Defendant's trading activity involved placing Spoof Orders and that Executive 3 and Trader 4 had discussed Defendant's spoofing.

xx.    In or around September 15, 2014, Defendant increased the size of his trades at Trading Firm B and began placing Spoof Orders as part of his trading strategy.    Shortly thereafter, the CME flagged Defendant's trading as potential spoofing activity, and Defendant was terminated from Trading Firm B on or about October 1, 2014.

Defendant's Method of Spoofing at Trading Firm B

yy.    A common technique employed by Defendant was to place and cancel one or more Spoof Orders on one side of the market at the prevailing market price.    The intent of these Spoof Orders was to facilitate the execution of an existing Primary Order on the opposite side of the market.    By placing Spoof Orders opposite the Primary Order,

-40-

Defendant intended to create a false appearance of supply or demand and induce other market participants, including those located in the Southern District of Texas, to react to this false information in order to move the market price and/or increase the available quantity at the desired price of the relevant futures contract.   During the time the Spoof Order was live in the market, or shortly after it was cancelled, Defendant's Primary Order on the other side of the market often would execute at a more favorable price than was otherwise available before the Spoof Order had been placed.

zz.    At all times during Conspiracy Period B, Defendant's purpose, intent, and motivation in conspiring with others in the placement of Spoof Orders was to create a false sense of supply or demand for purposes of inducing other market participants, including those located in the Southern District of Texas, to react, and artificially drive up or down the price of the E-Mini S&P futures contracts, or artificially increase the number of market participants willing to transact at the existing price, all so that he, and, ultimately, Trading Firm B, could profit or mitigate their potential losses by executing their positions at more favorable prices, quantities, and/or times than were otherwise available before Defendant placed the Spoof Orders.

aaa.    While it was the intent of the conspiracy to use Spoof Orders in order to facilitate the execution of Primary Orders at a more favorable price than was otherwise available before the Spoof Order had been placed, the spoofing techniques described herein did not always achieve the outcome desired by Defendant.   In some instances, the placement of Spoof Orders would not induce other market participants to trade at the level desired by Defendant, and Defendant would execute the Primary Order at the prevailing

market price.   In other instances, while it was the intent of Defendant to cancel a Spoof Order prior to its execution, all or part of the Spoof Order would execute, and Defendant would then act to reverse the unintended position, which reversal could generate a loss.

bbb.   As one example of Defendant's pattern of trading activity that is summarized above:

i.   On or about September 25, 2014, at approximately 12:44:34.566 p.m. Central Time, Defendant placed an iceberg Primary Order to buy 250 E-Mini S&P futures contracts, with only 12 orders visible to the market, at the price of $1,963.25, which was the best prevailing bid price at that point in time.

ii.   At approximately 12:44:36.390 p.m. Central Time, Defendant placed a Spoof Order, which was not iceberg, to sell 7 E-Mini S&P futures contracts at the price of $1,963.50, which was the best prevailing ask price at that point in time.   At approximately 12:44:36.391 p.m. Central Time, Defendant placed an additional 11 Spoof Orders to sell a total of 123 E-Mini S&P futures contracts at the same price of $1,963.50. At approximately 12:44:36.392 p.m. Central Time, Defendant placed another 11 Spoof Orders to sell a total of 120 E-Mini S&P futures contracts at the same price of $1,963.50.  Together, Defendant's 23 Spoof Orders constituted approximately 53% of the order book to sell E-Mini S&P futures contracts at that price level.

iii.   Third, less than 20 milliseconds after placing the final Spoof Order, Defendant's iceberg Primary Order to buy began to be filled and was completely

-42-

filled at approximately 12:44:36.414 p.m. Central Time, giving Defendant an overall short position of 210 lots in the E-Mini S&P futures contracts market.

iv.      Defendant's Spoof Orders were capable of influencing, and did influence, other market participants' decision to trade E-Mini S&P futures contracts. For example, approximately 20 milliseconds after Defendant placed the final Spoof Order, at 12:44:36.412 p.m. Central Time, Victim 1 placed an order to sell one E-Mini S&P futures contract at the price of $1,963.25, which was executed immediately. This futures contract sold by Victim 1 was bought by Defendant as part of the 250 futures contracts from his iceberg Primary Order referenced in the paragraph above.

v.       Approximately 857 milliseconds after the last fill of Defendant's Primary Order, at approximately 12:44:37.271 p.m. Central Time, Defendant cancelled his 1 Spoof Order to sell 7 lots at the best prevailing ask price of $1963.50 without any of the Spoof Order being filled. Likewise, at approximately 12:44:37.272 p.m. Central Time, Defendant cancelled 13 of his Spoof Orders of a total of 139 lots to sell at the same price of $1,963.50 without any of the Spoof Orders being filled. Finally, at approximately 12:44:37.273 p.m. Central Time, Defendant cancelled his remaining 9 Spoof Orders of a total of 104 lots to sell at the same price of $1,963.50 without any of the Spoof Orders being filled. All these Spoof Orders to sell had been active in the market for less than 1 second before Defendant cancelled them.

ccc.    During Conspiracy Period B, on behalf of himself, Trading Team B and

Trading Firm B, and in the scope of his employment at Trading Firm B and to earn Trading

Firm B additional profits, Defendant placed hundreds of Spoof Orders for E-Mini S&P

futures contracts.

## Breach of Plea Agreement

33.    If Defendant should fail in any way to fulfill completely all of the obligations under

this Agreement, the United States will be released from its obligations under the Agreement, and

Defendant's plea and sentence will stand.    If at any time Defendant retains, conceals, or disposes

of assets in violation of this Agreement, or if Defendant knowingly withholds evidence or is

otherwise not completely truthful with the United States, then the United States may move the

Court to set aside the guilty plea and reinstate prosecution.    Any information and documents that

have been disclosed by Defendant, whether prior to or subsequent to this Agreement, and all leads

derived therefrom, will be used against Defendant in any prosecution.

## Restitution, Forfeiture, and Fines – Generally

34.    This Agreement is being entered into by the United States on the basis of

Defendant's express representation that he will make a full and complete disclosure of all assets

over which he exercises direct or indirect control, or in which he has any financial interest.

Defendant agrees not to dispose of any assets or take any action that would effect a transfer of

property in which he has an interest, unless Defendant obtains the prior written permission of the

United States.

35.    Defendant agrees to make complete financial disclosure by truthfully executing a

sworn financial statement (Form OBD-500 or similar form) within 30 days of signing this

Agreement.   Defendant agrees to authorize the release of all financial information requested by the United States, including, but not limited to, executing authorization forms permitting the United States to obtain tax information, bank account records, credit histories, and social security information.   Defendant agrees to discuss and answer any questions by the United States relating to Defendant's complete financial disclosure.

36.     Defendant agrees to take all steps necessary to pass clear title to forfeitable assets to the United States and to assist fully in the collection of restitution and fines, including, but not limited to, surrendering title, executing a warranty deed, signing a consent decree, stipulating to facts regarding the transfer of title and the basis for the forfeiture, and signing any other documents necessary to effectuate such transfer.   Defendant also agrees to direct any banks that have custody of his forfeitable assets to deliver all funds and records of such assets to the United States.

37.     Defendant understands that forfeiture, restitution, and fines are separate components of sentencing and are separate obligations.

### Restitution

38.     Defendant agrees to pay restitution to the victims of Counts One and Two of the Criminal Information.   Defendant stipulates and agrees that the United States has calculated that, as a result of the criminal conduct of the Trading Team A, the victims incurred a monetary loss of at least $61,500,000, and that, as a result of the criminal conduct of the Trading Team B, the victims incurred a monetary loss of at least $1,390,000.   Defendant understands and agrees that the Court will determine the amount of restitution to fully compensate the victims.   Pursuant to 18 U.S.C. § 3664(h), if the Court finds that more than one defendant has contributed to the loss of the victims, the Court may make each defendant liable for payment of the full amount of restitution

-45-

or may apportion liability among the defendants to reflect the level of contribution to the victims' losses and economic circumstances of each defendant.   Defendant agrees that restitution imposed by the Court will be due and payable on a schedule determined by the Court and that Defendant will not attempt to avoid or delay payment.   Pursuant to 18 U.S.C. § 3664(f)(3)(B), the Court's restitution order may direct Defendant to make nominal periodic payments if the Court finds from facts on the record that the economic circumstances of Defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments.   Subject to the provisions of paragraph 19, Defendant waives the right to challenge in any manner, including by direct appeal or in a collateral proceeding, the restitution order imposed by the Court, except that, in connection with Defendant's sentencing by the Court, Defendant may seek to have the Court impose a restitution order consistent with 18 U.S.C. §§ 3664(f)(3)(B) & 3664(h).

39.     If the Court should order restitution, Defendant agrees to the entry of a Restitution Order in the amount determined by the Court as described above in paragraph 38.   Pursuant to 18 U.S.C. § 3663A(c)(2), Defendant agrees that an offense listed in § 3663A(c)(1) gave rise to this Agreement and as such, victims of the conduct described in the Criminal Information, Facts, or any related or similar conduct shall be entitled to restitution.   The parties further acknowledge, however, that pursuant to 18 U.S.C. § 3663A(c)(3), and based on information currently available to the United States:

a.     determining complex issues of fact relating to the amount of the victims' losses would complicate or prolong the sentencing process to a degree that the need to

provide restitution to any victim may be outweighed by the burden on the sentencing process; and

        b.     the number of identifiable victims may be so large as to make restitution impracticable.

To that end, Defendant agrees, pursuant to 18 U.S.C. § 3664(d)(5), that the Court may defer the imposition of restitution, if any, until after the sentencing; however, Defendant specifically waives the 90-day provision found at 18 U.S.C. § 3664(d)(5).   Defendant further acknowledges that, pursuant to 18 U.S.C. § 3664(k), he is required to notify the Court and the United States of any material change in economic circumstances that might affect his ability to pay restitution

### Forfeiture

40.     Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), Defendant agrees to forfeit to the United States voluntarily and immediately any and all right, title, and interests in any property, real or personal, which constitutes or is derived from proceeds that Defendant obtained directly and indirectly from the offense alleged in Counts One and Two (with respect to the conspiracies to commit wire fraud and commodities fraud), in violation of 18 U.S.C. § 371. Defendant agrees to waive the right to notice of any forfeiture proceeding involving the forfeiture of assets, and agrees not to file a claim or assist others in filing a claim in that forfeiture proceeding.

41.     Defendant knowingly and voluntarily waives the right to a jury trial on the forfeiture of assets.   Defendant knowingly and voluntarily waives all constitutional, legal, and equitable defenses to the forfeiture in any proceeding.   Defendant agrees to waive any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of excessive fine, to the forfeiture of assets by the United States or its subdivisions.   Defendant

-47-

agrees to waive any and all interest in any asset which is the subject of a related administrative or judicial forfeiture proceeding, whether criminal or civil, federal, or state.

42.     Defendant waives the requirements of Rules 32.2 and 43(a) of the Federal Rules of Criminal Procedure regarding notice of forfeiture in the charging instrument, announcement of forfeiture at sentencing, and incorporation of forfeiture in the judgment.

43.     Subject to the provisions of paragraph 19, Defendant waives the right to challenge the forfeiture of assets in any manner, including by direct appeal or in a collateral proceeding, except that, in connection with Defendant's sentencing by the Court, Defendant does not waive his right to challenge the amount of proceeds subject to forfeiture under *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), and its progeny.

44.     Defendant and defendant's attorney also understand that the United States may file motions for preliminary and final orders of forfeiture of assets, and they agree that the United States may file such motions unopposed and may state in the certificates of conference for the motions that Defendant has no objection to the relief sought without having to further contact Defendant or Defendant's attorney.

45.     If the Court should order restitution and in the event that Defendant submits a financial affidavit to the United States and the United States determines, in its sole judgment and discretion, that Defendant meets the criteria for restoration under the restoration policy of the Money Laundering and Asset Recovery Section ("MLARS") of the U.S. Department of Justice, including an inability to pay both restitution and forfeiture, the Fraud Section will submit a restoration request to MLARS that any amount obtained through forfeiture be applied towards any restitution ordered.   If, however, the United States determines, in its sole discretion, that

Defendant does not meet those criteria, the United States shall be under no obligation to make any such request. Defendant further understands that MLARS, which is not bound by this Agreement, retains ultimate discretion regarding whether to grant or deny any restoration request. Moreover, Defendant acknowledges that Defendant has no right to an offset against restitution for any property forfeited, *United States v. Sanjar*, 876 F.3d 725, 751 (5th Cir. 2017), and agrees not to challenge any decision made by the United States or MLARS with respect to any decision with respect to any restoration recommendation. Defendant also agrees not to request that the Court reduce or otherwise offset any forfeiture order entered by the amount of restitution ordered or any restitution order entered by the amount of any forfeiture ordered.

### Fines

46. Defendant understands that under the Sentencing Guidelines the Court is permitted to order Defendant to pay a fine that is sufficient to reimburse the United States for the costs of any imprisonment or term of supervised release, if any. Defendant agrees that any fine imposed by the Court will be due and payable immediately, and Defendant will not attempt to avoid or delay payment. Subject to the provisions of paragraph 19, Defendant waives the right to challenge the fine in any manner, including by direct appeal or in a collateral proceeding.

### Conclusion

47. Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

48. Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this

Agreement, the United States, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute Defendant not subject to any of the limits set forth in this Agreement, or may move to resentence Defendant or require Defendant's specific performance of this Agreement.   Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or Defendant breaches any of its terms and the United States elects to void the Agreement and prosecute Defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against Defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

49.     Defendant agrees that, should Defendant violate any of the conditions of this Agreement, or move to withdraw his plea of guilty:

a.     the "Factual Basis" set forth in this Agreement shall be admissible as substantive evidence in any criminal or civil proceeding brought against Defendant;

b.     all (i) statements made by Defendant to the United States Attorney's Office for the Southern District of Texas and/or Fraud Section or other designated law enforcement agents, and (ii) testimony given by Defendant before a grand jury or other tribunal, whether prior to or subsequent to the signing of this Agreement, and any leads from such statements or testimony, shall be admissible in evidence in any criminal or civil proceeding brought against Defendant; and

c.     Defendant shall assert no claim under the United States Constitution, the United States Sentencing Guidelines, any statute, Rule 410 of the Federal Rules of

Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule that the Factual Basis or any statements made by Defendant or any leads derived from such statements should be suppressed or are otherwise inadmissible.   It is the intent of this Agreement to waive all rights in the foregoing respects.

50.     Should the Court refuse to accept Defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

51.     Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

## Complete Agreement

52.     This written Agreement, consisting of 53 pages, including the attached addendum of Defendant and his attorney, constitutes the complete plea agreement between the United States, Defendant, and Defendant's counsel.   Defendant and his attorney acknowledge that no promises or representations have been made by the United States except as set forth in this Agreement. Defendant acknowledges that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is guilty.

53.     Any modification of this Agreement must be in writing and signed by all parties.

/

/

/

/

/

Filed at _Houston_ Texas, on _November 02_, 20_18_

_____                    _____
KAMALDEEP GANDHI                            MICHELLE LAGROTTA
Defendant                                   THOMAS GARDINER
                                            Attorneys for Defendant


Subscribed and sworn to before me on _November 02_, 20_18_

                          DAVID J. BRADLEY, Clerk
                          UNITED STATES DISTRICT CLERK

          By:    _____

                 Deputy United States District Clerk




SANDRA MOSER                                RYAN K. PATRICK
Acting Chief, Fraud Section                 United States Attorney


By: _____              By: _____
    MARK CIPOLLETTI                           JOHN LEWIS
    JEFFERY S. LE RICHE                        Assistant United States Attorney
    MATTHEW F. SULLIVAN                        Southern District of Texas
    Trial Attorneys
    Fraud Section
    U.S. Department of Justice


Approved by: _____

    BRIAN KIDD
    Acting Chief
    Securities & Financial Fraud Unit

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ' | |
| | ' | |
| **v.** | ' | **CRIMINAL NO.** 18cr609 |
| | ' | |
| **KAMALDEEP GANDHI,** | ' | |
| **Defendant.** | ' | |

### PLEA AGREEMENT – ADDENDUM

I have fully explained to Defendant his rights with respect to the Criminal Information filed in this case.   I have reviewed the provisions of the United States Sentencing Commission's Guidelines Manual and Policy Statements and I have fully and carefully explained to Defendant the provisions of those Guidelines which may apply in this case.   I have also explained to Defendant that the Sentencing Guidelines are only advisory and the Court may sentence Defendant up to the maximum allowed by statute per count of conviction.   Further, I have carefully reviewed every part of this plea agreement with Defendant.   To my knowledge, Defendant's decision to enter into this plea agreement is an informed and voluntary one.

| | |
|---|---|
| MICHELLE LAGROTTA | Date 9/17/18 |
| THOMAS GARDINER | |
| Attorneys for Defendant | |

I have consulted with my attorney and fully understand all my rights with respect to the indictment pending against me.   My attorney has fully explained, and I understand, all my rights with respect to the provisions of the United States Sentencing Commission's Guidelines Manual which may apply in my case.   I have read and carefully reviewed every part of this plea agreement with my attorney.   I understand this plea agreement and I voluntarily agree to its terms.

| | |
|---|---|
| KAMALDEEP GANDHI | Date 9/17/18 |
| Defendant | |